UNITED STATES of America,
Plaintiff–Appellee,

v.

Christine Marie McCORMAC, aka
Christine Bannerman; Danielle
Crrillo, Defendant–Appellant.

No. 02–30020.

United States Court of Appeals,
Ninth Circuit.

Submitted Sept. 11, 2002.*

Filed Oct. 29, 2002.

---

\* This panel unanimously finds this case suitable for decision without oral argument. See Fed. R. App. P. 34(a)(2).

Dean D. Chisholm, Kaplan & Chisholm, PLLP, Columbia Falls, MT, for the defendant-appellant.

Lori Harper Suek, Assistant United States Attorney, Great Falls, MT, for the plaintiff-appellee.

Before: HILL,** GOULD, and BERZON, Circuit Judges.

** The Honorable James C. Hill, Senior United States Circuit Judge for the Eleventh Circuit

GOULD, Circuit Judge.

Christine McCormac, a/k/a Christine Bannerman a/k/a Danielle Carillo, ("McCormac") was convicted by a jury on three counts of fraud: bank fraud, in violation of 18 U.S.C. § 1344(2); false statements in a loan application, in violation of 18 U.S.C. § 1014; and the use of a false social security number, in violation of 42 U.S.C. § 408(a)(7)(B). McCormac presents two issues on appeal. First, she appeals the district court's denial of her motion for mistrial when she was held in contempt in the presence of prospective jurors following her own outburst. Second, she appeals the district court's calculation of the amount of loss for purposes of determining her offense level under the sentencing guidelines for fraud convictions. We have jurisdiction on appeal to review the final decisions of the district court. 28 U.S.C. § 1291. We affirm both the district court's denial of a mistrial and calculation of loss under the sentencing guidelines.

I

On September 14, 2000, McCormac used the name Danielle Carillo to purchase a 1994 Jeep Cherokee Laredo from Power Chevrolet Kia in Helena, Montana. She signed a contract for the purchase of the vehicle using the Social Security number 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, which was not her own. The Power Chevrolet Finance Manager processed the application through the Helena Community Federal Credit Union (HCFCU) to secure financing for McCormac. On the loan application, McCormac said that she was employed under contract with several attorneys in the Helena area. On September 19, 2000, McCormac entered the HCFCU to open a checking account. She again used the name Danielle

Court of Appeals, sitting by designation.

Carillo and the Social Security number 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. McCormac opened the checking account with $5.00 and secured a loan for $9,244.00.

On October 12, 2000, McCormac returned to the HCFCU to apply for a credit card. The card was issued to her on October 13, 2000, and McCormac made the cash advance of $1,000 against the card, which was the maximum cash advance allowed. After being contacted by the HCFCU, the Federal Bureau of Investigation advised that McCormac had used a false Social Security number to secure the loan and credit line from HCFCU. The investigation also revealed that McCormac was not employed by attorneys in the Helena area.

In total McCormac received $10,244 from HCFCU by using the name Danielle Carillo and the Social Security number 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. McCormac never made any payment on the vehicle, nor did she repay the $1,000 cash advance. The vehicle was later repossessed by HCFCU, reducing HCFCU's actual loss to $6,438.

The defendant's motion for a mistrial arose as follows: Immediately before jury selection, out of the presence of prospective jurors, McCormac requested a continuance and asked the court to provide her with new defense counsel. Noting that two other capable defense counsel had previously been removed from McCormac's case upon her motion, the court denied McCormac's request, ruling that the motion was for the "sole purpose of delay."

After a five minute recess, the court started the voir dire process in the presence of prospective jurors. The court asked the parties if they were prepared to proceed with trial. The following extraordinary exchange took place:

The Court: [Defense Counsel], are you ready for trial?

[Defense Counsel]: Yes, Your Honor.

The Defendant: Defendant is not ready for trial, Your Honor.

The Court: You're in contempt.

The Defendant: That's fine, Your Honor.

The Court: Be seated.

The Defendant: No, Your Honor. I am not going to proceed with any trials. I told you that already. I feel that this is a biased situation, and there's not going to be any justice served by wasting the jurors' time—

The Court: Just a moment.

The Defendant: No.

The Court: Be quiet, please.

The Defendant: No.

The Court: I want the marshal to remove the defendant and bring her to my chambers. I'll see counsel in chambers, please.

In chambers, McCormac was warned that she would be removed from the trial if she could not behave properly in the courtroom; she would be confined to her cell until she alerted the marshal of her willingness to cooperate. At this point, defense counsel moved for a mistrial and that motion was promptly denied. After the hearing in chambers, McCormac was removed from the trial proceeding, but permitted to return to the courtroom later that afternoon. After commencing with voir dire, in light of the previous improper outburst, the court issued a cautionary statement to the jury:

The Court: Now, Ms. Carillo filed some motions before the court which were heard this morning before the jury selection. And the motions were denied. And she became upset and has refused to be seated quietly during the trial. And so the court has had to remove her. I am sorry that we don't have the facilities here that we have in

Billings where we could have her watch the trial through a television monitor. But, I assure you that I have told her that any time she can come back into the courtroom. All she has to do is tell me that she will behave and deport herself appropriately during the trial, and I would welcome her back at any time. But I cannot permit her to disrupt the trial by standing and speaking out of turn and that sort of thing. And so she is not going to be here in the courtroom during the trial. Now, unfortunately, she did make a small outburst which some of you may have heard and listened to just before we began jury selection. And I want to make certain that there wasn't anything there that was said by her or any action by her that would in any way cause any of you to be less than fair and impartial to both sides of the case. And now, if there is anyone who feels differently and feels that it would cause you to be other than fair to both sides of the case, please raise your hand. All right. I don't see any hands; and therefore, we will proceed.

## II

■ McCormac challenges her conviction based on the district court's refusal to grant a mistrial. She argues that her credibility was damaged when the district court held her in contempt in the presence of prospective jurors after she argued with and defied the federal judge. We review the district court's refusal to grant a mistrial for abuse of discretion, *United States v. Sarkisian*, 197 F.3d 966, 981 (9th Cir. 1999), and we affirm.

■ The district court's assessment of the jury's ability to remain impartial despite the explosion of defiance from the defendant is accorded substantial weight because the district court is in the best position to ascertain whether an event is prejudicial. *Sarkisian*, 197 F.3d at 982. The district court explained the circumstances of McCormac's improper defiance to the jurors and asked the jurors during voir dire whether they would be able to serve impartially despite the outburst. No juror said that the outburst would prejudice their decision, and there is no indication on the record that the outburst "so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict." *Id.* at 981 (citations omitted).

■ Equally important, the district court's fair, matter-of-fact explanation of the circumstances of McCormac's earlier out burst and his careful inquiry into the jurors' ability to remain impartial were sufficient to cure any prejudicial effects, because juries are presumed to heed cautionary instructions by the court. *See United States v. Randall*, 162 F.3d 557, 559 (9th Cir.1998); *Lii v. United States*, 198 F.2d 109, 111 (9th Cir.1952) (holding that a jury is presumed to heed the district court's instruction to disregard the fact that the defendants were held in contempt and admonished before the jury).

Were we to adopt a contrary rule and find error in this case, McCormac would profit from her own misconduct, which of course would not be correct. Before the start of jury selection, the district court denied McCormac's motion for a continuance and motion to dismiss her third defense counsel, finding that those motions were delay tactics. Although there is no finding that McCormac's outburst was calculated with malign purpose to delay the trial, we must consider effect: the district court would have been de facto granting a continuance by declaring a mistrial and summoning new jurors. We decline here to find that the district court abused its

discretion in denying a mistrial when the defendant's own misconduct caused the alleged impartiality of the jurors and the court took reasonable steps to ensure the jurors could serve impartially. *Williams v. Woodford,* 306 F.3d 665, 723–24 (9th Cir.2002) ("The Sixth Amendment affords no relief when the defendant's own misconduct caused the alleged juror partiality and the trial judge employed reasonable means under the circumstances to preserve the trial's fairness") (citing *United States v. Hernandez,* 952 F.2d 1110, 1116–18 (9th Cir.1991)). *See also United States v. Harris,* 2 F.3d 1452, 1456 (7th Cir.1993) (holding that a defendant should not profit from his own outburst).

Because the district court afforded the prospective jurors an opportunity to voice any potential impact of the outburst on their partiality and because the defendant in such circumstances should not be permitted to benefit from her own misconduct, we hold the district court did not abuse its discretion in declining to grant a mistrial.

## III

We turn now to calculation of loss for sentencing purposes. McCormac's debt to HCFCU totaled $10,244: She first obtained $9,244 as financing for her new vehicle and later got a $1,000 cash advance from her credit card with HCFCU. Because HCFCU recovered part of the debt by repossessing and selling McCormac's vehicle after she was arrested, the actual loss suffered by HCFCU was $6,438. The district court determined McCormac's offense level pursuant to the 2001 United States Sentencing Guidelines ("Guidelines") § 2B1.1(b)(1), using a calculated loss of $10,244.

McCormac argues that the district court erred in its loss calculation because McCormac contends that the district court should have reduced the gross amount of the debt by the amount that HCFCU recovered by repossessing and selling her car. We review the district court's construction, interpretation, and application of the Guidelines de novo, and we review the district court's factual findings for clear error. *Randall,* 162 F.3d at 560. We reject McCormac's arguments and affirm the district court's loss calculation.

The Guidelines used by the district court became effective November 1, 2001, and incorporated amendments into the application notes for § 2B1.1(b)(1), the section under which McCormac's sentence was determined. Notably, the 2001 amendments retain the core rule that has framed the calculation of loss in fraud convictions under previous guidelines: "[L]oss is the greater of the actual or intended loss." U.S. Sentencing Guidelines Manual § 2B1.1, cmt. n. 2(A) (2001). *See also United States v. Allen,* 88 F.3d 765, 770 (9th Cir.1996) (under the 1991 Sentencing Guidelines, " '[l]oss' is calculated using the greater of the 'intended loss' or the 'actual loss' ") (citing deleted U.S. Sentencing Guidelines § 2F1.1 cmt. n. 7); *United States v. Galliano,* 977 F.2d 1350, 1352 (9th Cir.1992) (applies same rule under the 1988 Sentencing Guidelines) (citing deleted U.S. Sentencing Guidelines § 2F1.1 cmt. n. 7).[1]

In applying this general rule under earlier sentencing guideline provisions, we, along with our sister circuits, concluded that when the defendant fraudulently obtains a loan and does not intend to repay

---

1. Because loss is the basis for determining the defendant's offense level in § 2B1.1, the calculation of loss is used as a proxy for assessing the culpability of the defendant. U.S. Sentencing Guidelines Manual app. C, at 1207.

any part of the loan, the offense level is based on the gross amount of the loan, irrespective of whether the victim was able to recoup part of the loss by selling any assets pledged to secure the loan. *See Galliano,* 977 F.2d at 1352–53. *See also United States v. Nichols,* 229 F.3d 975, 979 (10th Cir.2000) ("The fact that a victim has recovered part of its loss after discovery of a fraud does not diminish the defendant's culpability for purposes of sentencing"); *United States v. Johnson,* 16 F.3d 166, 170–71 (7th Cir.1994) (even if the victim was able to recoup some of the loss, the Guidelines direct that intended loss should be considered if it is greater than the actual loss); *United States v. Johnson,* 908 F.2d 396, 398 (8th Cir.1990) (the offense level does not turn on whether the banks recovered any of their losses, but turns on the loss the defendant attempted to inflict).

McCormac's objection to the district court's calculation of loss is based on the concept in application note 2(E)(ii) to § 2B1.1 of the Guidelines, wherein loss is to be reduced by the amount that the victim has recovered at the time of sentencing from the disposition of any collateral pledged by the defendant. U.S. Sentencing Guidelines Manual § 2B1.1, cmt. n. 2(E)(ii) (2001).[2] The application notes and the commentary to the amendments do not say whether this credit against loss applies to both actual loss and intended loss. We are persuaded that application note 2(E)(ii) is consistent with this circuit's, and our sister circuits', application of the "greater of" rule when we read it to affect the calculation of actual loss, but not intended loss. Such a reading, moreover, is consistent with the general framework otherwise provided by the § 2B1.1 application notes for several reasons.

First, application note 2(A) provides: "Subject to the exclusions in subdivision (D), loss is the greater of the actual loss or intended loss." U.S. Sentencing Guidelines Manual § 2B1.1, cmt. n. 2(A) (2001). Were we to exclude the amount recovered by disposition of collateral in both an actual loss and intended loss calculation, we would essentially read the general rule subject to the exclusions in subdivision (D) and (E), even though the sentencing commission has explicitly limited the exclusions to those enumerated in subdivision (D) only.

■ Second, the 2001 amendments adopt a broad definition of "intended loss." Intended loss includes the "pecuniary harm that was intended to result from the offense," whether or not that pecuniary harm "would have been impossible or unlikely to occur." U.S. Sentencing Guidelines Manual § 2B1.1, cmt. n. 2(A)(ii) (2001). *See also* U.S. Sentencing Guidelines Manual app. C at 1205 (the broad definition of intended loss precludes using concepts such as "economic reality" in determining intended loss). Under this definition, it is irrelevant to the intended loss calculation that a bank is unlikely to suffer the total intended loss when a defendant pledges collateral to secure a loan. To the extent that collateral pledged to secure a loan informs the loss calculation, it affects the calculation of the actual loss and may illuminate the determination of the defendant's intent. *See, e.g., United States v. Williams,* 292 F.3d 681, 686 (10th Cir. 2002) (recovered assets are not automatically deducted from intended loss but collateral pledged "is a valid consideration in evaluating a defendant's realistic intent") (citations omitted).

---

**2.** McCormac cited as grounds for her objection a predecessor provision, § 2F1.1, within the 2000 Guidelines superseded by the provision above.

Because application note 2(E)(ii) does not automatically require intended loss to be reduced by proceeds from disposition of collateral, our analysis is based on a calculation of McCormac's intended "pecuniary harm." U.S. Sentencing Guidelines Manual § 2B1.1, cmt. n. 2(A)(ii). The 2001 amendments to the sentencing guidelines for fraud make clear that intended loss should not be an inquiry into intent to repay, as suggested by case law interpreting the prior sentencing guideline, but rather should focus on the intended financial harm. *See id.* Thus, even though in many instances this will simply be an inquiry into whether a defendant intended to repay, when collateral is involved courts must also consider whether a defendant planned to return the collateral or anticipated that such collateral would be repossessed or foreclosed on by the lending institution. *See Williams*, 292 F.3d at 686 (holding that a court should consider pledged collateral when determining the amount of the intended loss).

Applying that standard here, we find that based on the record before us the district court's finding that McCormac "intended not to return the collateral" was not clearly erroneous. First, that McCormac's vehicle was pledged as collateral for the loan on that vehicle presents no special insight to McCormac's intended loss; new vehicles are routinely secured as assets to their loans and are done so in most instances as a matter of course. Second, McCormac filled out her loan application with fraudulent information. As a result, it was reasonable to conclude that HCFCU would have difficulty locating her in order to repossess her vehicle. It is undoubted-ly difficult to track down a person when the only information you have is a fictitious name, a false social security number belonging to someone else, an inaccurate place of employment, and only a temporary address at a shelter where the person was no longer staying. Therefore, we affirm the district court's calculation of loss based on McCormac's intention not to repay the loan and to prevent HCFCU from collecting the pledged collateral.

**AFFIRMED.**