# United States Court of Appeals
## For the First Circuit

No. 07-2813

UNITED STATES OF AMERICA,

Appellee,

v.

EDUARDO RODRÍGUEZ-VÉLEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Stephen J. Weymouth and Law Offices of Stephen J. Weymouth on brief for appellant.
Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney (Appellate Chief), and Luke Cass, Assistant United States Attorney, on brief for appellee.

March 1, 2010

---

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA**, <u>Circuit Judge</u>. On May 4, 2005, a federal grand jury sitting in the District of Puerto Rico charged defendant-appellant Eduardo Rodríguez-Vélez and seven codefendants with, inter alia, conspiracy to possess with intent to distribute 50 grams or more of cocaine base (crack) and a detectable amount of marijuana. <u>See</u> 21 U.S.C. §§ 841(a)(1), 846. All of the other defendants admitted their guilt and, in October of 2006, the appellant stood trial alone. The jury found him guilty on the conspiracy count, and the district court, relying in part on an information filed by the government in pursuance of 21 U.S.C. § 851(a), sentenced him to life imprisonment.

Before us, the appellant claims that the district court committed a litany of errors in (i) denying his motion for judgment of acquittal; (ii) making erroneous evidentiary rulings; (iii) denying his motion for a mistrial based on the appellant's outburst at trial; (iv) denying his motion for a mistrial based on prosecutorial misconduct; and (v) improperly enhancing his sentence. We reject this entire asseverational array and, accordingly, affirm the judgment below.

## I. BACKGROUND

The government presented its case through four witnesses. The appellant neither testified nor proffered any evidence. We rehearse the facts elicited at trial to the extent necessary to place this appeal into a workable perspective.

-2-

The government's first witness was José Luís Vélez (Vélez), a confidential informant for the federal Drug Enforcement Administration (DEA) and a former retail drug customer. Vélez testified that Callejón de Los Locos was an "active" drug point in Cabo Rojo, Puerto Rico. Members of the Graniela-Lugo (Graniela) family operated the drug point and, from at least as early as 1996, sold marijuana, cocaine, and crack to "selected people." Vélez was one of these people; he bought marijuana two to three times per week from roughly 1997 to 2003. He also made occasional purchases of cocaine from the drug point.

Vélez began working with the DEA in 2003 and made two recorded purchases of crack from the drug point.[1] The first purchase involved four bags; the second involved ten bags. With the ten-bag purchase, Vélez received a free bonus bag of crack — a fringe benefit that, he testified, was consistent with customary practice at the drug point.

David Ulises Martínez-Camacho (Martínez), a confidential informant and a former retail drug customer, testified that he visited the drug point nearly every day from 1996 to 2000. His last visit took place in 2004. He purchased marijuana and, starting in 2000 or 2001, crack.

Martínez dated one of the Graniela sisters. That romantic entanglement allowed him to enter the Granielas' residence

---

[1] These recordings had both audio and video components.

on an average of twice a week.  At times, the Granielas pressed him into service; he "cooked" crack (i.e., manufactured crack from cocaine) for them at the drug point on two or three occasions.

Martínez outlined the logistics of marketing at the drug point, which was open year-round.  Its hours of operation were from noon to midnight on Saturday to Thursday, and noon to 1 a.m. on Friday.  Patrons had the option of purchasing drugs on foot or by drive-through.  To avail himself of the latter option, a customer would drive up to a seller, place his order, drive down a dirt road, turn around, and park next to a fence.  At that locus, the drugs were exchanged for cash.

Retail sales often involved an encoded language, couched in terms more commonly associated with haberdasheries than with criminal enterprises.  In this argot, "shoe" meant crack, "shirt" meant cocaine, and "pants" meant marijuana.

Martínez vouchsafed that he knew the appellant by the sobriquet "El Barbero" and knew him to be a brother-in-law of the Granielas.  Martínez added that on an occasion when the quality of crack available at the drug point seemed sub par, one of the Granielas told him that, if he waited, the appellant would bring a new supply of cocaine to be manufactured into crack.  On other occasions, a Graniela brother, Iván, told Martínez that when the appellant arrived, the drug point would have "new material." On still other occasions when the supply of drugs was running low,

-4-

either Iván Graniela or his brother Papotin would make a telephone call to order more drugs and mention the appellant's name. Once, Martínez saw Iván Graniela give the appellant a wad of bills three to four inches thick.

José Luna, a DEA agent who worked undercover and surveilled the drug point over one hundred times between 1995 and 2005, was the government's next witness. He described the overall nature of the government's investigation. From his personal observations, sales of approximately 840-1000 grams of crack each week were made at the drug point.

The DEA made five separate undercover purchases of crack at the drug point (including the two made by Vélez) from 2003 to 2005. One of these was videotaped from a lamp-post video camera, and Luna described the activity taking place at the drug point as shown in the videotape.

The government's final witness was Francisco Vega Montalvo (Vega), who served as a confidential informant for the DEA since approximately 2003. Vega testified that he lived in Cabo Rojo for about six years and was "very close" to the appellant. The two men sold drugs together from 1998 to 2001. They participated jointly in at least seven deals aimed at procuring cocaine or marijuana for the drug point. We sketch Vega's accounts of these seven incidents.

The first incident occurred in September of 1998. The appellant expressed concern that the drug point had exhausted its supply of crack and enlisted Vega's help. Vega arranged for the purchase of one kilogram of cocaine and ten pounds of marijuana. Vega, the appellant, and Jorman (whom Vega identified as the appellant's "runner") then proceeded to an apartment complex and bought the drugs for $28,000. The appellant directed Jorman to deliver the goods to the drug point.

The second incident occurred in May of 1999. The appellant, Jorman, and another man went to Vega's store and paid $18,000 to a man named Chaka for a kilogram of cocaine. Vega saw not only the cocaine but also a cash-filled briefcase. After the transaction was consummated, the appellant instructed Jorman to take the cocaine to the drug point and inform "the guys" that he (the appellant) would tell them the price later.

The third incident took place in September of 2000. It involved a purchase of ten pounds of marijuana. Vega, the appellant, Jorman, and a man named Freddie Camacho were in attendance. Camacho went into an apartment and returned with the drugs. The appellant gave one pound to Vega, priced the remainder at $1,900 per pound, and directed Jorman to take it to the drug point.

The fourth incident occurred in October of 2000. Vega met with the appellant at the home of the appellant's mother to

discuss replenishing the drug point.  There, two hangers-on, Chapi and Amarillo, mentioned a fisherman who had found twenty kilograms of cocaine and was willing to sell it for $10,000 per kilogram.  The appellant stated that twenty kilograms would be enough to supply the drug point for two weeks and hatched a plot to steal the drugs.  Vega declined to take part in the plot and never learned what happened next.

The fifth incident occurred in November of 2000.  Vega, Jorman, Camacho, and the appellant went to a car wash to buy one kilogram of cocaine for $20,000.  The appellant emphasized that he wanted cocaine of the "BMW" brand because that was the best brand for processing into crack.  After the transaction was completed, Vega and Jorman used the appellant's car to drive to a street near the drug point.  There, a runner met them.  Jorman told the runner that "this is going to the Callejón and tell those nuts to square off the money that I'm owed."

The sixth incident occurred in December of 2000.  Vega, the appellant, Jorman, and another man purchased one kilogram of BMW brand cocaine from a man in a truck.  After completing the transaction, the appellant ordered Jorman to deliver the cocaine for "Cabo Rojo" and to inform "the guys" that he would tell them the price later.

The final incident occurred in early 2001.  Vega and the appellant purchased one kilogram of cocaine at a bakery in exchange

for some heroin. The appellant directed Jorman to take the cocaine to the drug point.

Vega stopped dealing drugs in 2001 and agreed to cooperate with the DEA roughly two years later. He succeeded in recording five conversations with the appellant. We summarize the material aspects of two such conversations:

> 1. On May 10, 2004, the appellant told Vega that the drug point was "too hot" and that everyone there was going to get arrested.

> 2. On June 15, 2004, the appellant stated that he had stopped doing business with the Granielas on credit. He added that he made his livelihood from the Granielas and that he was being more cautious because of how "hot" the drug point had become. He also claimed to have started the drug point.

## II. ANALYSIS

We address the appellant's five claims of error sequentially.

### A. Sufficiency of the Evidence.

We begin with the appellant's claim that his motion for judgment of acquittal, Fed. R. Crim. P. 29, should have been granted for lack of evidence. We review this sufficiency of the evidence claim de novo, appraising the proof in the light most favorable to the verdict. United States v. Stierhoff, 549 F.3d 19, 26 (1st Cir. 2008). This appraisal must take into account both direct and circumstantial evidence. Id. The verdict must stand unless the evidence is so scant that a rational factfinder could

-8-

not conclude that the government proved <u>all</u> the essential elements of the charged crime beyond a reasonable doubt.  <u>United States</u> v. <u>O'Brien</u>, 14 F.3d 703, 706 (1st Cir. 1994).

The essential elements of the crime of conspiracy are "the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy."  <u>United States</u> v. <u>Bristol-Mártir</u>, 570 F.3d 29, 39 (1st Cir. 2009).  To establish a defendant's willing participation, the government must show "two kinds of intent: intent to agree and intent to commit the substantive offense."  <u>Id.</u> (citations and internal quotation marks omitted).  But the government need not offer proof of an express agreement; criminal conspiracies are by their very nature clandestine, and a tacit agreement inferred from the surrounding circumstances can — and often does — suffice to ground a finding of willing participation.  <u>United States</u> v. <u>Boylan</u>, 898 F.2d 230, 243 (1st Cir. 1990).

In this instance, we need not tarry.  The government adduced compelling evidence of each element of the charged conspiracy, and a rational jury easily could find beyond a reasonable doubt — as this jury did — that the appellant was guilty of conspiracy to possess with intent to distribute 50 grams or more of crack and a detectable amount of marijuana.

To begin, the existence of a conspiracy was plainly inferable from the testimony recounted above.  Vélez vouchsafed

that the drug point sold crack, marijuana, and other drugs from 1996 to 2003. This was consistent with the testimony of Martínez, who also described the drug point's hours and methods of operation. Luna conservatively estimated that at least fifteen drug sales (ten of crack) were consummated hourly, totaling about 840-1000 grams of crack per week. Vega related that the appellant had on several occasions ordered Jorman to deliver cocaine (much of which was slated to be used for the manufacture of crack) and marijuana to the drug point.

This testimony adequately evinced the existence of a highly organized drug-trafficking enterprise that required the efforts of multiple participants. Surely, then, a rational juror could conclude that a conspiracy of the type and kind charged operated at the drug point for many years.

The appellant's knowledge of the conspiracy hardly can be doubted. That knowledge was vividly illustrated by his conversations with Vega. For example, he discussed how he started the drug point, how its notoriety had spread, and how the drug point had become "too hot." He also remarked that he earned his livelihood from the Granielas. These self-incriminating statements were corroborated by Vega's and Martínez's testimony that the appellant supplied the drug point with both cocaine (much of which was slated to be used for the manufacture of crack) and marijuana.

Finally, there was ample evidence from which a rational juror could find that the appellant willingly participated in the conspiracy. Vega testified to the appellant's role in no fewer than five drug deals, each involving the purchase of at least one kilogram of cocaine. Similarly, he testified about the appellant's part in two deals involving the purchase of marijuana. Vega likewise testified that, after the consummation of each transaction, the appellant gave instructions to a subordinate to bring the contraband to the drug point. In one instance, the appellant specifically asked for a particular brand of cocaine because of its superiority as a raw material for manufacturing crack. This testimony fits hand in glove with Martínez's testimony that, on multiple occasions, the Graniela brothers told him that the appellant was bringing new inventory to the drug point.

In an effort to blunt the force of this copious evidence, the appellant suggests that much of it should be disregarded as self-serving and not believable. This may have been a suitable argument for the jury, but it is not an appropriate argument here. On a motion for judgment of acquittal, we must resolve all credibility issues in favor of the verdict. See United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1995). The appellant also argues that the evidence, even if credited, shows him to be a free-

lance entrepreneur rather than a coconspirator.[2]  But where, as here, the evidence can be viewed in different ways, we must honor the jury's evaluative choice among plausible, albeit competing, inferences.  See United States v. Olbres, 61 F.3d 978, 974-75 (1st Cir. 1995).

To say more on this claim would be to paint the lily. The evidence, taken as a whole, strongly supports a conclusion that the appellant entered into a tacit accord to supply the drug point with drugs and that he intended by his actions to further the conspiracy's overarching drug-distribution goal.  Accordingly, the district court did not err in denying the appellant's motion for judgment of acquittal.

## B.  **Evidentiary Rulings**.

When an appropriate objection has been made, we review a district court's ruling admitting or excluding trial evidence for abuse of discretion.  United States v. Nguyen, 542 F.3d 275, 279 (1st Cir. 2008); United States v. DeCologero, 530 F.3d 36, 58 (1st Cir. 2008).  Here, the appellant challenges two such rulings.  One was made during Martínez's direct examination and the other during his cross-examination.  We elaborate below.

---

[2] In particular, the appellant emphasizes Martínez's testimony that he purchased ten bags of crack from the appellant at some time between 2001 and 2005.  When Martínez inquired about a bonus bag, the appellant replied that he did not give bonus bags because of the superior quality of his merchandise.  This testimony, the appellant says, indicates that he was an independent contractor.

1. **Direct Examination**. The appellant assails the admission of Martínez's testimony that certain statements were made to him by either Iván Graniela or Iván's brother to the effect that the appellant would be delivering new material to the drug point. Relatedly, the appellant challenges Martínez's testimony that, when supplies ran low at the drug point, either Iván or Papotin Graniela would in his presence make a telephone call to order more drugs and mention the appellant's name. Finally, he challenges Martínez's testimony that the appellant and two of his cohorts "had the strongest say" about staffing the surveillance tower at the drug point.

These challenges are meritless. The Granielas' statements were not inadmissible as hearsay. After all, a statement is not hearsay if it is made by a coconspirator during the course and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). The Granielas' statements invited Martínez, who was a regular customer, to wait until the appellant got to the drug point and replenished its drug supply. These statements were, therefore, made during and in furtherance of the charged conspiracy. See, e.g., United States v. Rodríguez, 525 F.3d 85, 101 (1st Cir. 2008).

So, too, were the statements made by the Granielas while calling to order more inventory. These statements were made in the course of ensuring that the drug point remained up and running.

-13-

Consequently, they came under the protective shield of Rule 801(d)(2)(E).

This leaves the comment about staffing the surveillance tower. In that regard, the government established on Martínez's direct examination that the tower was an integral part of the Granielas' operation and that Martínez had personal knowledge about who called the shots concerning its staffing. Thus, Martínez's comment as to who "had the strongest say" was lay opinion, based on the observations of a percipient witness. It follows that the trial court did not err in allowing him to testify anent the staffing decisions. <u>See</u> <u>United States</u> v. <u>Muñoz-Franco</u>, 487 F.3d 25, 35 (1st Cir. 2007); <u>see</u> <u>also</u> Fed. R. Evid. 701.

**2. <u>Cross-Examination</u>.** The appellant argues that the trial court unduly limited the scope of Martínez's cross-examination. We briefly recount the relevant background.

The appellant was married to one of the Granielas' sisters. During Martínez's cross-examination, defense counsel inquired whether Martínez was aware that the appellant had been unfaithful to his wife. The government objected. At sidebar, the district court asked defense counsel the purpose of the question. Counsel responded:

> **[Defense Counsel]:** It is highly relevant. If you allow me, this witness just asked that the Granielas family trust him with his life.
>
> . . .

**[Defense Counsel]:** If he knows them that well, Your Honor, he must know the particularities of each member of the family.

**[Prosecutor]:** That is not true, and it is irrelevant.

**[Defense Counsel]:** It goes to the credibility of the Defendant — the credibility of the witness.

The district court sustained the objection.

In this venue, the appellant advances two supposed justifications as to why the inquiry into his infidelity should have been allowed. We examine these justifications separately.

First, the appellant claims that the question was relevant to impeach Martínez's testimony as to how well he knew the appellant. This argument was made to and rejected by the district court. Therefore, we review the court's ruling for abuse of discretion.

Although the right to cross-examine an adverse witness in a criminal case is constitutionally guaranteed, see Davis v. Alaska, 415 U.S. 308, 315 (1974), that right is not unfettered. See Boylan, 898 F.2d at 254. On the contrary, the trial judge retains wide latitude to impose reasonable limits on cross-examination so as to prevent, among other things, questioning on peripheral matters. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Here, whether Martínez knew that the appellant was unfaithful to his wife raised an extraneous (and potentially inflammatory) issue and was at most marginally relevant to Martínez's credibility. Thus, it was not an

-15-

abuse of discretion for the lower court to curtail this line of inquiry. See Boylan, 898 F.2d at 255. That ruling helped to keep the jury focused on the issues that mattered.

The second justification on which this claim of error rests is the notion that the inquiry into infidelity should have been permitted to impeach the Granielas (whose statements Martínez had quoted). Because the Granielas were the appellant's brothers-in-law, this thesis runs, his infidelity would give them a motive to attribute criminal conduct to him.

This argument has several obvious flaws. First, the question posed did not go to what the Granielas knew but, rather, to what Martínez knew. What Martínez knew (or did not know) about the putative infidelity would have no necessary bearing on what the Granielas knew. Second, the "motive to vilify" argument does not hold water. There is no evidence that the Granielas suspected they were operating in the presence of one who would subsequently become a government informant, and what they said about the appellant tended to glorify him — that is, to exalt his role in the criminal enterprise — not to vilify him.

To cinch matters, a searching review of the record reveals that the appellant neither presented this argument to the district court nor made an offer of proof as to the existence of facts that would have allowed the court to conclude that his infidelity might be relevant to the Granielas' motivation. There was, for example,

-16-

no evidence that any infidelity occurred prior to the making of the statements or that, if it did, the Granielas were aware of it. Thus, the appellant's challenge fails. See Fed. R. Evid. 103(a)(2) (requiring offer of proof to preserve objection to ruling excluding evidence); see also United States v. Jadusingh, 12 F.3d 1162, 1166 (1st Cir. 1994) ("When challenging an exclusionary ruling . . . the aggrieved party must show . . . that the 'substance of the evidence [sought to be introduced] was made known to the court by offer or was apparent from the context within which questions were asked.'" (citation omitted)).[3]

## C. **Disruption of Trial**.

We turn next to the appellant's plaint that the district court abused its discretion in denying his mid-trial motion for a mistrial premised on his own disruption of the proceedings. Before exploring this plaint, we sketch the events that form the backdrop for it.

After the jury entered the courtroom on the fourth day of trial, the appellant rose and began shouting in Spanish. The district court immediately ordered a marshal to "shut him up" and "sit him down." The court then excused the jury for the remainder of the day. Before doing so, it instructed the jurors that they

---

[3] In some cases, there may still be room for plain-error review. See Fed. R. Evid. 103(d); Jadusingh, 12 F.3d at 1166. Here, however, the reasons alluded to above make it pellucid that sustaining this objection was not on any level an abuse of discretion.

were not to consider the incident or any statement made by the appellant during his outburst.[4]  It also instructed the jurors to keep their minds open about the merits of the case.

The next day, the court repeated these instructions and conducted a voir dire in which it asked each juror whether he or she was able to remain impartial notwithstanding the outburst.  All of the jurors responded affirmatively.  The appellant moved for a mistrial, but the court denied the motion.  The appellant did not request any further or different jury instructions.

Against this backdrop, we review the district court's denial of the mistrial motion for abuse of discretion.  See DeCologero, 530 F.3d at 52; United States v. Bradshaw, 281 F.3d 278, 284 (1st Cir. 2002).  This deferential standard of review does not permit second-guessing for the sake of second-guessing.  Only in rare instances will we, from the vantage point of a cold appellate record, substitute our judgment for the trial court's first-hand determination that the interests of justice could be served without aborting a trial already in progress.  United States v. Pierro, 32 F.3d 611, 617 (1st Cir. 1994).

Although the appellant's vociferations were not entered into the record, the court's subsequent comments (made out of the jurors' earshot) enlighten us as to their substance: it appears that

---

[4] It is common ground that jurors in the District of Puerto Rico normally are fluent in Spanish, and there is no question but that the jurors both saw and heard the appellant's outburst.

the appellant accused a government witness, Martínez, of prevaricating; accused the government of fabricating the case against him; and expressed dissatisfaction with the performance of his trial counsel. Thus, the comments themselves did not impart information prejudicial to the defense.

For present purposes, then, the appellant's plaint centers on the bad impression that his loss of control may have created. Withal, the appellant is in a perilously poor position to complain about that bad impression. When a defendant has willfully disrupted the proceedings, a trial court ordinarily acts within its discretion in refusing to grant a mistrial by reason of that disruption. See, e.g., United States v. McCormac, 309 F.3d 623, 626 (9th Cir. 2002); United States v. Harris, 2 F.3d 1452, 1456 (7th Cir. 1993); United States v. Trevino-Rodriguez, 994 F.2d 533, 535 (8th Cir. 1993); United States v. Bamberger, 456 F.2d 1119, 1128 (3d Cir. 1974). Were the rule otherwise, a defendant could, in effect, ensure a mistrial by the simple expedient of disrupting the proceedings. This would reward bad behavior and, thus, create perverse incentives. See Harris, 2 F.3d at 1456 ("[T]o allow a defendant by his own misconduct to terminate his trial even temporarily would be to allow him to profit for his own wrong." (quoting United States v. Chaussee, 536 F.2d 637, 641 (7th Cir. 1976))).

Even so, such unruliness cannot simply be ignored. A trial court confronted by such an outburst should take proper steps

to neutralize any untoward effects that the outburst might have on the jury.  <u>See</u>, <u>e.g.</u>, <u>McCormac</u>, 309 F.3d at 626.  Here, the district court's timely and repeated instructions to the jury, coupled with its thorough vetting of the jurors to ensure that their impartiality had not been compromised, sufficed to safeguard the appellant's right to a fair trial.  Thus, we find no abuse in the district court's refusal to declare a mistrial because of the outburst.

### D. **Prosecutorial Misconduct**.

The appellant again moved for a mistrial toward the end of the trial.  This second motion followed the prosecutor's thrice-repeated reference, in summation, to the prosecution's evidence as "unchallenged."  The relevant portions of the summation follow.

> And I would add that the testimony you heard from Task Force Agent Luna, aside from the objections from the defense, went unchallenged, unchallenged.
>
> . . .
>
> Now, I state this again, you may not like Francisco Vega or what Francisco Vega did in the past, but his testimony was unchallenged. His testimony was unchallenged.
>
> . . .
>
> Ladies and gentlemen of the jury, that evidence [audio recordings of the defendant conversing with Vega], presented to you yesterday, went unchallenged.  That's the defendant's voice.

The appellant did not interpose a contemporaneous objection to the first of these statements.  He did, however, interpose contemporaneous objections to the second and third statements.

-20-

The district court initially overruled these objections. But after a sidebar conference and a recess that followed the first round of the government's closing argument,[5] the court concluded that the prosecutor's comments were improper and vowed to give a curative instruction. At that juncture, the appellant unsuccessfully sought a mistrial, the court gave the promised instruction, the closing arguments continued without any reiteration of the challenged characterization, and the judge repeated the curative instruction in his charge to the jury.

The question of whether the prosecutor's comments abridged the appellant's Fifth Amendment rights is a question of law and, thus, engenders de novo review. See United States v. Glantz, 810 F.2d 316, 321 n.2 (1st Cir. 1987). The Fifth Amendment invests a criminal defendant with a right to remain silent and, as a corollary of that right, prohibits the government from commenting on the defendant's silence. Griffin v. California, 380 U.S. 609, 615 (1965). A comment on the defendant's failure to testify need not be direct in order to cross the constitutional line: the government infringes the defendant's Fifth Amendment rights whenever "the language used [by the prosecutor is] manifestly intended or [is] of such character that the jury would naturally and necessarily take

---

[5] The district court used a familiar three-part format in which the prosecutor initiates the closing arguments, defense counsel responds, and the prosecutor then rebuts.

it to be a comment on the failure of the accused to testify."
Glantz, 810 F.2d at 322.

The appellant asseverates that the prosecutor's comments, quoted above, come within the Glantz proscription.  But this is far from a foregone conclusion.  While the remarks can be interpreted as comments on the appellant's failure to testify, they also can be interpreted as a means of drawing attention to defense counsel's decision not to cross-examine either Luna or Vega.  The fact that the prosecutor referred to the evidence as "unchallenged" only in connection with evidence involving these witnesses makes the latter interpretation plausible.  This is a potentially important distinction: although it is not proper for a prosecutor to comment on a defendant's failure to testify, it is permissible (though dangerous) for a prosecutor to comment on the defense's failure to cross-examine a witness.  See, e.g., United States v. Hooker, 541 F.2d 300, 307 (1st Cir. 1976); Goitia v. United States, 409 F.2d 524, 528 (1st Cir. 1969).

Despite the fact that the resolution of this ambiguity ordinarily might make a dispositive difference, the circumstances here are such that we need not grapple with that question. Assuming, without deciding, that the prosecutor's comments were beyond the pale, no mistrial was required.  We explain briefly.

With respect to Fifth Amendment violations of this genre, harmless error doctrine applies.  United States v. Hasting, 461 U.S.

-22-

499, 507-09 (1983). Consequently, such a violation is not automatically a basis for setting aside a conviction. If examination shows that the violation is harmless beyond a reasonable doubt, the conviction may stand. To this end, we must make an inquiry into whether it is clear beyond a reasonable doubt that the jury would have returned the same verdict absent the prosecutor's comment. Id. at 510-11.

We have sometimes used a four-part analytic modality to guide the inquiry into the harmlessness of such a violation. The factors to be evaluated are the severity of the misconduct, the context in which the misconduct occurred, the deployment and likely impact of any curative instructions, and the strength of the evidence against the accused. See, e.g., United States v. Rodríguez, 215 F.3d 110, 122-23 (1st Cir. 2000); Taylor, 54 F.3d at 978-80; United States v. Hardy, 37 F.3d 753, 758-59 (1st Cir. 1994). This evaluation should be made in the first instance by the trial court; if that court, confronted with a comment that infringes the defendant's Fifth Amendment rights, finds the comment harmless and denies a motion for a mistrial, we review that decision for abuse of discretion. Glantz, 810 F.2d at 321 n.2.

In this case, the district court's refusal to order a mistrial is inexpugnable. None of the four factors cuts the appellant's way. The violation (assuming that one occurred) was not severe, and the context does not favor jettisoning the verdict.

After all, the comments were made in the opening portion of the prosecutor's summation, see supra note 5, so that defense counsel could tailor his argument accordingly.

The third factor likewise counsels against disturbing the verdict. The district court gave timely, thorough, and repeated curative instructions. The court specifically identified the challenged comments, explained why they could be viewed as improper, told the jury to disregard them, and emphasized the appellant's right not to testify or present evidence. These instructions were sufficient to neutralize any prejudice that might have attended the challenged comments. See United States v. Mooney, 315 F.3d 54, 60 (1st Cir. 2002) (noting that instructions are "sometimes enough to neutralize any prejudice from improper remarks"); see also United States v. Smith, 145 F.3d 458, 462 (1st Cir. 1998) (explaining that "courts must presume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case").

Last — but far from least — this was not a close case. The able district judge characterized the proof against the appellant as "enormous." That characterization seems apt: the government offered overwhelming evidence on each and every element of the charged conspiracy.

On this claim of error, all of the signposts point in the same direction. Accordingly, we hold that, even if the prosecutor's

comments were improper — a matter on which we take no view — the misconduct was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967). It follows inexorably that the district court did not abuse its discretion in denying this motion for a mistrial.

## E. Increased Punishment.

The appellant's last argument implicates his sentence. In the course of the proceedings, the government filed an information pursuant to 21 U.S.C. § 851(a), proffering two prior felony drug convictions as a stepping stone for increased punishment should the appellant be found guilty. After the jury verdict, the district court, in reliance on this filing, deemed the appellant subject to increased punishment. See id. § 851(d). The court thereupon imposed a life sentence, which included the increase. See id. § 841(b)(1)(A).

The appellant contends that these rulings were erroneous in various respects. Specifically, he contends that section 851(e) — which forecloses a defendant from challenging the validity of prior convictions entered more than five years before the date of the government's section 851(a) filing — offends the Due Process and Equal Protection Clauses of the federal Constitution and should not have been enforced. He adds that the statute also transgresses the rule of Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). Finally

he contends that the filing of a section 851(a) information in this case constituted impermissible prosecutorial vindictiveness.

Here, however, there is a rub.  The appellant acknowledges that, in these respects, the district court acted in strict conformity with circuit precedent.  See Appellant's Br. at 34-36. By like token, he acknowledges that the contentions that he mounts can prevail only if we overrule a number of this court's precedents. See, e.g., United States v. Jenkins, 537 F.3d 1, 5 (1st Cir. 2008); United States v. Henderson, 320 F.3d 92, 104-10 (1st Cir. 2003).

This proposition that we can overrule our own precedents at will is untenable.  With only narrow exceptions, none of which pertain here,[6] an argument panel is bound by prior panel decisions of the court.  See United States v. Rodríguez, 527 F.3d 221, 224-25 (1st Cir. 2008) ("As a general rule, newly constituted panels in a multi-panel circuit are bound by prior panel decisions closely on point."); United States v. Wogan, 938 F.2d 1446, 1449 (1st Cir. 1991) (same).  Because we lack authority to overrule the precedents that the appellant targets, we reject this claim of error without inquiry into its merits.

---

[6] These exceptions center on situations involving supervening authority, such as "when the holding of a previous panel is contradicted by controlling authority, subsequently announced (say, a decision of the authoring court en banc, a Supreme Court opinion directly on point, or a legislative overruling)."  Muskat v. United States, 554 F.3d 188, 189 (1st Cir. 2009).

**III.  CONCLUSION**

We need go no further.  After thorough perscrutation of the record, we conclude that the appellant was fairly tried, justly convicted, and appropriately sentenced.


**Affirmed**.