# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 9, 2025 Session

## STATE OF TENNESSEE v. REBECCA M. DAVIS

**Appeal from the Circuit Court for Lauderdale County**
**No. 11333     A. Blake Neill, Judge**

_____

### No. W2024-00943-CCA-R3-CD

_____

Defendant, Rebecca M. Davis, appeals her convictions for one count of aggravated child abuse of a child eight years of age or less, one count of aggravated child neglect of a child eight years of age or less, and two counts of aggravated child endangerment of child eight years of age or less. After a sentencing hearing, Defendant received an effective sentence of fifteen years' incarceration. On appeal, Defendant argues that (1) the trial court erred by denying her motion for judgments of acquittal for aggravated child endangerment and aggravated child neglect of a child eight years of age or less; (2) the trial court erred by not merging her convictions for aggravated child endangerment with her respective convictions for aggravated child abuse of a child eight years of age or less and aggravated child neglect of a child eight years of age or less; and (3) the trial court violated her due process rights by allowing the State to comment on and elicit testimony regarding her pre-arrest, post-*Miranda* silence. After review, we reverse the trial court's denial of Defendant's motion for judgment of acquittal for her aggravated child neglect conviction but otherwise affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part, Reversed and Vacated in Part; Remand for Clerical Error**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TOM GREENHOLTZ, JJ., joined.

William W. Gill (on appeal), Assistant Public Defender—Appellate Division of the Tennessee District Public Defender's Conference; David Stowers, Assistant Public Defender (at trial), Covington, Tennessee, for the appellant, Rebecca M. Davis.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Mark Davidson, District Attorney General; and Julie Pillow, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

Defendant and Love Anderson, her husband, were indicted by a Lauderdale County Grand Jury for one count of aggravated child abuse of a child eight years of age or less in Count 1, two counts of aggravated child endangerment of a child less than eight years of age or less in Counts 2 and 4, and one count of aggravated child neglect of a child eight years of age or less in Count 3. Defendant and Mr. Anderson were jointly tried, and the following facts were adduced at trial.

On February 4, 2022, the victim was born to Defendant and Mr. Anderson. For most of the victim's early life, Defendant and Mr. Anderson cared for the victim. From the victim's birth to March 23, 2022, Defendant and Mr. Anderson took the victim to Dr. Michael Abdelmisseh, a pediatrician, for regular checkups. Dr. Abdelmisseh described the victim as a "regular baby" and testified that he never suspected any mistreatment of the victim. Around two to three weeks after the victim's birth, Defendant and Mr. Anderson began to enlist the help of Latonjo Booker and Diana Brown in caring for the victim whenever Defendant and Mr. Anderson had to work. Ms. Booker was Mr. Anderson's mother, and Ms. Brown was Ms. Booker's mother. Ms. Booker and Ms. Brown described the victim as "healthy" and "happy."

On March 30, 2022, Ms. Booker cared for the victim. On March 31, 2022, Ms. Brown picked the victim up from Ms. Booker to return him to Defendant and Mr. Anderson. From March 31 to April 6, 2022, the victim remained in the care of Defendant and Mr. Anderson. Neither Ms. Booker nor Ms. Brown noticed anything wrong with the victim's health prior to April 6, 2022.

On April 6, 2022, Mr. Anderson called Ms. Brown to ask whether she could care for the victim while he and Defendant worked. Ms. Brown agreed to meet Mr. Anderson in Ripley, Tennessee. When Ms. Brown picked up, he was sleeping in a baby carrier, but he awoke around one to two hours later when Ms. Brown attempted to clean and feed him. The victim began to cry and continued to cry "all night." Ms. Brown could not console him. Ms. Brown described the victim's behavior as "unusual" because the victim was usually quiet. Ms. Brown denied that anything happened while the victim was in her care that caused his "fussy" demeanor. Concerned for the victim, Ms. Brown called Ms. Booker and informed Ms. Booker that she was bringing the victim to her because he would not stop crying.

When Ms. Booker received the victim from Ms. Brown, he was swaddled in a baby carrier and "still crying a little bit." At some later point, Ms. Booker removed the victim

from the carrier and noticed that his arm was "dangling" and his eye was bruised. Ms. Booker examined the victim and noticed that he would "holler" every time she touched his injured arm or his legs. Ms. Booker decided to take the victim to the hospital in Dyersburg, Tennessee, and called Mr. Anderson while on the way there. When she remembered that Mr. Anderson was working, she hung up and called Defendant. When Defendant answered, Ms. Booker explained the victim's injuries and informed Defendant that she was taking the victim to the Dyersburg hospital. When Ms. Booker asked Defendant whether she was aware of the victim's injuries, Defendant claimed to be unaware of them and explained that she had not "looked over" the victim that day because she was at work. Defendant also accused Ms. Booker and Ms. Brown of causing the injuries. Ms. Booker denied causing the injuries, asking Defendant whether she had "lost her mind."

At some point during the drive to the hospital, Defendant placed Ms. Booker in a three-way call between Defendant, Ms. Booker, and Mr. Anderson. Ms. Booker asked Defendant and Mr. Anderson to meet her at the hospital. Mr. Anderson explained that he was at work and did not have money for gas. Defendant claimed that she also did not have money for gas and that her family was busy with work and unable to drive her to the hospital. Ms. Booker asked Mr. Anderson to take off work and offered to pay for the couple's gas if they could somehow get to the hospital. Mr. Anderson said he would "see what he could do." Defendant and Mr. Anderson never went to the Dyersburg hospital.

When Ms. Booker and the victim arrived at the Dyersburg hospital, Caitlin Hawkins, a physician's assistant ("PA"), examined and treated the victim. PA Hawkins immediately noticed that the victim appeared to be experiencing "discomfort." She noted that the victim exhibited "mild eye swelling and discoloration to the left upper eyelid" and a "deformity of the left arm." PA Hawkins performed a "full assessment" of the victim, including a "head-to-toe examination [and] neuro assessment." She also performed a series of X-rays on the victim and discovered a fracture of his left arm, which she described as requiring "blunt force, and . . . a twisting and pulling sensation at the time of the force." From these injuries, PA Hawkins suspected child abuse. She explained, "[y]ou shouldn't have a two-month-old with an arm injury of this sense without suspicion. . . . Pediatric bones are very hard to break . . . , especially in the middle of a long bone." PA Hawkins further explained that these injuries could have occurred as little as "an hour" but "up to [seventy-two] hours" before the examination. The X-rays performed on the victim's torso and legs did not reveal any injuries. Based on the severity of the victim's injuries, the Dyersburg hospital decided to transport him by ambulance to Le Bonheur Children's Hospital in Memphis, Tennessee.

Ms. Booker rode in the ambulance with the victim. When they arrived at Le Bonheur in the early hours of April 7, 2022, Dr. Lauren Burge, a child abuse pediatrician, was tasked with investigating whether the victim was a victim of child abuse. Dr. Burge

ordered a skeletal survey of the victim and a CT scan of his head. The CT scan revealed a fracture to the left side of the victim's skull and bleeding over the brain under the fracture. The skeletal survey confirmed the victim's fractured left arm. Dr. Burge explained that the injury was caused by a "twisting force." The skeletal survey also revealed a "corner fracture" to the victim's right leg that "showed some healing," which Dr. Burge described as "highly specific for abuse [in non-mobile infants] . . . because we don't see it very often in any other injuries." She explained, "this type of fracture is caused through forcible traction and torsion[.]" Dr. Burge also discovered fractures on the victim's ribs in different stages of healing, indicating that "whatever caused [the victim]'s rib fractures happened more than one time." Dr. Burge explained, "[i]t is harder to break baby ribs than adult ribs . . . . [W]hen we see rib fractures in a non-mobile infant who hasn't been in a car wreck or anything like that, it makes us worry that something happened." She further testified, "rib fractures are highly specific for abuse in young infants." Dr. Burge concluded that the victim's injuries resulted from child abuse.

Defendant and Mr. Anderson attempted to visit the victim at Le Bonheur "some days later" but were denied access to the victim because of suspected child abuse.

In detailing why Dyersburg hospital was unable to discover the rib fractures with its X-rays, Dr. Burge stated, "rib fractures are notoriously difficult to identify[, so] to [her] it's not concerning that an . . . adult radiologist wasn't able to see the rib fractures." Dr. Burge also testified that the rib fractures would have been "tricky" for a caregiver to recognize because a child is unable to communicate the source of their pain, especially if the caretaker had not caused the injuries. However, Dr. Burge also explained that a caretaker's noticing of the victim's injuries when attempting to dress or care for him was a "distinct possibility" because the victim had "broken arms and legs and ribs." She stated, "It's going to hurt . . . . That would not feel great."

Medical personnel at Le Bonheur placed the victim's arm in a swath to "keep his bones still so that it w[ould] heal on its own." Dr. Burge explained that surgery was unnecessary because "baby bones heal really well."

At the close of the State's evidence, Defendant and Mr. Anderson moved for judgments of acquittal on all counts, and the trial court denied both motions. Although Mr. Anderson testified on his own behalf, Defendant presented no proof at trial and otherwise stood on her motion by not cross-examining Mr. Anderson or the State's rebuttal witnesses.

The jury found Defendant and Mr. Anderson guilty as charged on all counts. The trial court sentenced Defendant to an effective fifteen years' incarceration with the Tennessee Department of Correction.

Defendant moved for a new trial, and the trial court denied the motion. Defendant appealed.

*Analysis*

*Motion for Judgment of Acquittal*

Defendant first argues that the trial court erred by denying her motion for judgments of acquittal at the close of the State's case-in-chief. The State argues that the court properly denied Defendant's motion. After reviewing the record and the parties' arguments, we find that the trial court did not err by denying Defendant's motion as to Counts 2 and 4. However, we find that the trial erred by denying Defendant's motion as to Count 3.

Tennessee Rule of Criminal Procedure 29 allows a defendant to move for a judgment of acquittal at the close of either side's case-in-chief on some or all the charges presented in the indictment. A trial court's decision to grant or deny a motion for judgment of acquittal is a question of law, which this Court reviews de novo with no presumption of correctness. *State v. Weems*, 619 S.W.3d 208, 221 (Tenn. 2021) (citing *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013)). In determining whether such a decision was erroneous, this Court applies "the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Where the Rule 29 motion at issue was made at the close of the State's case-in-chief and the defendant stands on his or her motion by presenting no further proof, this determination requires us to "look only at all of the evidence introduced by the State, to take the strongest legitimate view of it in favor of the State, and to allow all reasonable inferences from it in the State's favor.'" *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The ultimate question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The defendant bears the burden on appeal to demonstrate that the evidence is insufficient to support his conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). We may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions as to the credibility of witnesses and the weight of the evidence, as well as factual issues raised by such evidence, are resolved by the trier of fact, not this Court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). Defendant concedes that the evidence was sufficient as to her

conviction on Count 1, so our review is limited to whether the evidence was sufficient to sustain Defendant's convictions in Counts 2, 3 and 4.

As an initial matter, Defendant argues that the State has waived its argument on this issue by "including numerous inappropriate references to the record and by relying on facts outside the scope of the standard of review." Specifically, Defendant argues that the State inappropriately cited to evidence in the record admitted at trial after her motion for judgments of acquittal. The State asks us to strike the inappropriate references from its brief and argues that its appropriate references to evidence presented in its case-in-chief are sufficient. We agree with the State. From our review of the State's brief, we find that its references to the appropriate portions of the record are sufficient to support its arguments and provide for meaningful appellate review. *See* Tenn. R. App. P. 27(a)(7)(A). Because Defendant moved for judgments of acquittal at the close of the State's case-in-chief and stood on the motion by presenting no further proof, we will review both Defendant's and the State's arguments, considering only the references made to evidence presented in the State's case-in-chief. *See Hall*, 656 S.W.2d at 61.

Defendant was convicted of aggravated child endangerment in Counts 2 and 4. As charged in Count 2, "[a] parent or custodian of a child eight (8) years of age or less commits child endangerment who knowingly exposes such child to . . . abuse or neglect resulting in physical injury or imminent danger to the child[.]" T.C.A. § 39-15-401(c)(1). As charged in Count 4, "[a] parent or custodian of a child eight (8) years of age or less commits child endangerment who . . . knowingly fails to protect such child from abuse or neglect resulting in physical injury or imminent danger to the child[.]" *Id.* Child endangerment as charged in Counts 2 and 4 is aggravated where the abuse or neglect results in serious bodily injury to the child. T.C.A. §39-15-402(a)(1). For purposes of these sections,

> "Knowingly" means the person knew, or should have known upon a reasonable inquiry, that abuse to or neglect of the child would occur which would result in physical injury to the child. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary parent or legal custodian of a child eight (8) years of age or less would exercise under all the circumstances as viewed from the defendant's standpoint[.]

*Id.* § -401(c)(2)(B). Defendant does not contest that she was the victim's parent and that the victim was less than eight years of age at the time of the offense.

Defendant was convicted of aggravated child neglect of a child eight years of age or less in Count 3. As charged in this count, a person commits child neglect of a child eight years of age or less when he or she "knowingly . . . neglects a child [eight years of age or

less] . . . so as to adversely affect the child's health and welfare[.]" *Id.* § -401(b). Child neglect as charged in Count 3 is aggravated where the neglect results in serious bodily injury to the child. T.C.A. § 39-15-402(a)(1). To show that the victim's health and welfare were adversely affected, "the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." *State v. Mateyko*, 53 S.W.3d 666, 671-72 (Tenn. 2001). "[A] mere risk of harm in the neglect context is . . . insufficient." *Id.* at 671. Child neglect is a "nature-of-conduct offense, meaning that the offense seeks principally to proscribe the nature of the defendant's conduct[.]" *Id.* at 673. A person acts "knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). Defendant does not contest that the victim was less than eight years of age at the time of the offense.

Where a defendant's neglect or endangerment of the child "results in serious bodily injury to the child[,]" the defendant commits aggravated child neglect or aggravated child endangerment. T.C.A. § 39-15-401(a)(1). "Serious bodily injury to the child" is defined to include, as relevant here, "a fracture of any bone, . . . subdural or subarachnoid bleeding, . . . [and] injuries to the skin that involve severe bruising[.]" *Id.* § -402(c). For Count 2, the State elected to indict Defendant based on D.A's "[b]roken left arm, skull fracture, brain bleed, [and] bruised eye and forehead[,]" which the State alleged occurred at some point between March 31 and April 6, 2022. For Counts 3 and 4, the State elected to indict Defendant based on the victim's "[m]ultiple rib fractures, bucket handle corner fracture of [his] right leg, [and his] fractured left leg[,]" which the State alleged occurred at some point between the victim's birth and April 6, 2022. Defendant does not contest that these injuries constitute serious bodily injuries.

In a light most favorable to the State, the evidence established that Defendant and Mr. Anderson, both parents of the victim, cared for the victim from his birth to April 6, 2022, and had exclusive custody of the victim from March 31 to April 6, 2022. When Ms. Brown returned the victim to Mr. Anderson on March 31, the victim exhibited no injuries. When Ms. Brown retrieved the victim from Mr. Anderson on April 6, Ms. Brown noticed that something was wrong with the victim when he awoke a few hours later and began to cry incessantly. Ms. Brown promptly called Ms. Booker for aid. After Ms. Brown gave the victim to Ms. Booker, Ms. Booker discovered the victim's "dangling" arm and bruised eye. Ms. Booker immediately took the victim to the Dyersburg hospital. While on the way to the hospital, Ms. Booker called Defendant and Mr. Anderson. Ms. Booker pleaded with Defendant and Mr. Anderson to come to the hospital. Mr. Anderson declined because he was at work and did not have money for gas, and Defendant refused because she did not have anyone to take her to the hospital.

At the Dyersburg hospital, PA Hawkins performed a series of X-rays on the victim that revealed a fractured arm. PA Hawkins immediately suspected child abuse, describing the injury as requiring "blunt force, and . . . a twisting and pulling sensation at the time of the force." She explained, "[y]ou shouldn't have a two-month-old with an arm injury of this sense without suspicion." The Dyersburg hospital then transferred the victim to Le Bonheur, where Dr. Burge was tasked with investigating whether the victim was a victim of child abuse. Dr. Burge ordered a skeletal survey and CT scan of the victim, which further revealed a skull fracture, a healing "corner fracture" to the victim's right leg, and brain bleeding. Dr. Burge described the "corner fracture" as "highly specific for abuse" in non-mobile infants, such as the victim. She explained, "this type of fracture is caused through forcible traction and torsion[.]" The skeletal survey also revealed multiple rib fractures in differing stages of healing, indicating that "whatever caused [the victim]'s rib fractures happened more than one time." Dr. Burge further explained that "rib fractures are highly specific for abuse in young infants[,]" and she concluded that the victim's injuries resulted from abuse.

Both Ms. Booker and Ms. Brown testified that nothing occurred to the victim while he was in their care that could have caused the injuries. Defendant and Mr. Anderson never arrived at the Dyersburg hospital and only attempted to visit the victim at Le Bonheur a few days later, but Le Bonheur refused them entry because of suspected child abuse.

For Count 2, a reasonable jury could infer that Defendant "knowingly expose[d]" the victim to "abuse or neglect" that resulted in "serious bodily injury"– the victim's broken left arm, fractured skull, brain bleed, and bruised eye and forehead.[1] *See* T.C.A. §§ 39-15-401(c)(1); -402(a)(1). Defendant argues that the evidence is insufficient because "the State presented no proof making it more likely that [Defendant] inflicted the injuries as opposed to Mr. Anderson." However, the State was not required to show that Defendant inflicted the victim's injuries, but only that she "knowingly expose[d the victim] to abuse or neglect resulting in" the serious bodily injuries. *See id.* §§ 401(c)(1);- 402(a)(1). Defendant also contends that the evidence was insufficient to show that she "knowingly expose[d the victim] to abuse or neglect resulting in" the injuries because the State failed to introduce "additional distinct proof" that Defendant knew that such abuse or neglect would occur. However, Defendant and Mr. Anderson had exclusive custody of the victim during the time in which the injuries occurred. The evidence supported the inference that the victim suffered abuse on multiple prior occasions, as shown by the victim's fractured ribs being "highly specific for abuse" and being in multiple stages of healing. Dr. Burge testified that

---

[1] For Count 2, the state elected "to submit for [the jury's] consideration" the alleged exposure of the victim to abuse resulting in the alleged broken left arm, left side skull fracture, left side brain bleed and the left eye and forehead of the victim that occurred sometime between March 31, 2022, and April 6, 2022.

the victim's injuries from the prior abuse—the fractured ribs and legs—would have caused him to be "fussy" and could have been discovered when dressing or caring for him. Therefore, a reasonable jury could infer beyond a reasonable doubt that Defendant "knew, or should have known upon a reasonable inquiry," that such prior abuse was occurring but continued to "expose[]" the victim to such abuse, eventually resulting in the victim's broken left arm, fractured skull, brain bleed, and bruised eye and forehead. *See id.* § -401(c)(2)(B). A reasonable jury could also conclude that such continued exposure "constitute[d] a gross deviation from the standard of care that an ordinary parent or legal custodian . . . would exercise under all the circumstances as viewed from [D]efendant's standpoint[.]" *See id.*

For Count 4, a reasonable jury could conclude beyond a reasonable doubt that Defendant "knowingly fail[ed] to protect [the victim] from abuse or neglect" that resulted in "serious bodily injury"—the victim's multiple rib fractures, bucket handle corner fracture of his right leg, and fractured left leg. *See id.* §§ 39-15-401(c)(1); -402(a)(1). Defendant asserts that the evidence was insufficient because "the State presented no proof demonstrating which of the victim's caretakers were taking care of him when the injuries were inflicted" or "prov[ing] that any such failure to protect the victim by [Defendant] caused or contributed to his rib or leg injuries." However, the evidence indicated that the injuries in Count 4 were "highly specific" for child abuse, and the only people that cared for the victim during the period in which the injuries occurred were Defendant, Mr. Anderson, Ms. Brown, and Ms. Booker. Ms. Booker and Ms. Brown both denied causing the injuries, and the jury's verdict reflects that it credited their respective testimony. Furthermore, the rib fractures being in multiple stages of healing indicated that multiple instances of abuse had occurred, and Dr. Burge testified that these injuries could have been discovered when dressing or caring for the victim. Based upon this evidence, the jury could reasonably infer that Defendant and/or Mr. Anderson caused the injuries and that Defendant "knowingly failed to protect" the victim from the abuse, resulting in the victim's multiple rib fractures, bucket handle corner fracture of his right leg, and fractured left leg. *See id.*

We agree, however, with Defendant that the evidence was insufficient to support her conviction for aggravated child neglect in Count 3.[2] In order to sustain a conviction for aggravated child neglect as indicted in Count 3, the State was required to prove that Defendant's neglect "resulted in" victim's rib and leg fractures. *Id.* § -402(a)(1). The State argues that the evidence was sufficient because it supported the inference that Defendant failed to seek medical treatment for the victim's rib and leg fractures. However, the failure

_____

[2] For Count 3, the State elected "to submit for [the jury's] consideration" the alleged multiple rib fractures, bucket handle corner fracture of the right leg and the fractured left leg of the victim that occurred sometime between February 5, 2022, and April 6, 2022.

to seek medical treatment for the victim's rib and leg fractures cannot "result[] in" the rib and leg fractures. Consequently, the State failed to show that Defendant's neglect "result[ed] in serious bodily injury." *See id.*; *see also State v. Dykes*, No. E2001-01722-CCA-R3-CD, 2002 WL 197417, at *7 (Tenn. Crim. App. Aug. 16, 2002), (reversing the defendant's conviction for aggravated child neglect because "there [was] no proof from which a rational jury could conclude that the delay [in seeking medical treatment]—that is, the neglect—caused serious bodily injury"), *no perm. app. filed*; *see also State v. Freeman*, No. W2005-02904-CCA-R3-CD, 2007 WL 426710, at *8 (Tenn. Crim. App. Feb. 6, 2007), (finding insufficient evidence to support the defendant's conviction for aggravated child neglect because "the proof does not demonstrate that it was [the defendant's failure to seek medical treatment] which caused the serious bodily injury" because "the proof established that it was the [defendant's] acts of abuse which produced the serious bodily injury"); *no perm. app filed*; *State v. Barlow*, No. W2008-01128-CCA-R3-CD, 2010 WL 1697772, at *11 (Tenn. Crim. App. Apr. 26, 2010), (vacating the defendant's conviction for aggravated child neglect because "the evidence showed that [the defendant's] initial act of abuse caused serious bodily injury to the victim" and not "[the defendant's] delay in seeking medical treatment"), *perm. app. denied*. Similarly, the record is devoid of any evidence that Defendant's failure to seek medical treatment for the victim's fractured ribs and legs had an "actual, deleterious effect or harm upon [the victim's] health or welfare." *See Mateyko*, 53 S.W.3d at 671-72; *see also State v. Raymundo*, No. M2009-00726-CCA-R3-CD, 2010 WL 2540207, at *15 (Tenn. Crim. App. Nov. 10, 2010), (reversing the defendant's conviction for aggravated child neglect because "the State failed to show that the [d]efendant's delay in obtaining medical attention for the victim had an 'actual, deleterious effect' on the victim's health" where the evidence did not "support[] the proposition that the victim['s injury was] from other causes besides the act of abuse"), *no perm. app. filed*; *Barlow*, 2010 WL 1697772, at *11 (finding that the State "failed to establish that [the defendant's] delay in seeking medical treatment had an 'actual, deleterious effect' on the victim's health" because the victim's injury was caused by the "initial act of abuse"). To the contrary, Dr. Burge testified that the victim's rib and leg fractures were "healing" when they were discovered, and the victim did not require any corrective surgery for any of his injuries. Consequently, we reverse the trial court's denial of Defendant's motion for judgment of acquittal and vacate Defendant's conviction in Count 3. The trial court's denial of Defendant's motion as to Counts 2 and 4 are affirmed.

## *Merger*

Defendant argues that the trial court erred by not merging her convictions for aggravated child endangerment in Counts 2 and 4 with her respective convictions for aggravated child abuse and aggravated child neglect based on the same injuries in Counts 1 and 3. The State responds that Defendant has waived this issue on appeal by failing to make a contemporaneous objection at the sentencing hearing and is not entitled to plain

error relief. Defendant replies that plain error review is inappropriate or, in the alternative, she is entitled to plain error relief. Because we vacate Defendant's conviction in Count 3, the issue as to whether Counts 3 and 4 merge is moot. As to the issue of whether Counts 1 and 2 merge, we agree with the State.

In criminal cases, the doctrine of plain error permits appellate courts to consider issues that were not properly preserved for appellate review. Tennessee Rule of Appellate Procedure 36(b), the plain error doctrine, states in part that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." It is well-settled that the discretionary authority to invoke the plain error doctrine should be "sparingly exercised," *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), because "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *State v. Northern*, 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and dissenting) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)).

At the sentencing hearing, the trial court asked, "Do any of [Defendant's and Mr. Anderson's convictions] merge?" The State responded, "I don't think they would merge. I think they are standalone convictions." The trial court asked defense counsels for Defendant and Mr. Anderson whether they agreed with the State that the convictions would not merge, and the defense counsel for Mr. Anderson responded, "Off the top of my head, Judge, I'd say they wouldn't[.]" Defense counsel for Defendant did not object. "The failure to make a contemporaneous objection constitute[s] a waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). Defendant argues that plain error review is nevertheless improper because this Court has "ordered merger as a ministerial sentencing correction without any inquiry into plain error." However, this Court has routinely applied plain error review to unpreserved merger issues. *See State v. Miller*, No. W2016-00402-CCA-R3-CD, 2017 WL 244115, at *4 (Tenn. Crim. App. Jan. 20, 2017), *no perm. app. filed*; *see also State v. Wiley*, No. W2024-01409-CCA-R3-CD, 2025 WL 2081741, at *9 (Tenn. Crim. App. July 24, 2025), *no perm. app. filed*. Therefore, we find that Defendant has waived plenary review of this issue and plain error review is appropriate.

To determine whether a trial error rises to the level of justifying plain error relief, we look to the following five factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did

not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014). Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *Adkisson*, 899 S.W.2d at 642).

The United States Constitution provides that "[n]o person [shall] be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. Similarly, the Tennessee Constitution provides that "no person shall, for the same offence, be twice put in jeopardy of life or limb." Tenn. Const. art. I § 10. "[U]nder certain circumstances, two convictions or dual guilty verdicts must merge into a single conviction to avoid double jeopardy implications." *State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015). For instance, merger is required when a jury returns guilty verdicts on two offenses, one of which is a lesser-included offense of the other. *Id.* (citing *State v. Davis*, 466 S.W.3d 49, 77 (Tenn. 2015)). Merger is also required when a jury returns guilty verdicts on two counts that represent alternative theories of the same offense. *Id.* (citing *State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998); *State v. Cooper*, 336 S.W.3d 522, 523-34 (Tenn. 2011)).

Defendant does not claim that her convictions merge under any of these exceptions. Instead, she claims that Tennessee recognizes a third exception that requires merger "when a jury returns multiple guilty verdicts of aggravated child abuse, aggravated child neglect, or aggravated child endangerment, all arising under Tennessee Code Annotated section 39-15-402(a)(1) and all premised on the same serious bodily injury." In support of her argument, Defendant solely relies on *State v. Bradshaw*, No. W2014-00175-CCA-R3-CD, 2015 WL 523688, at *8 (Tenn. Crim. App. Feb. 9, 2015), *perm. app. denied*. In *Bradshaw*, the trial court merged the defendant's nine convictions into one conviction for aggravated child abuse. *Id.* at *5. However, the judgment sheets entered by the trial court reflected that "the *sentences* merged" rather than the "*judgments* merged." *Id.* at *5 n.2 (emphasis in original). Consequently, a panel of this Court remanded the case back to the trial court to remedy the clerical error. *Id.* The issue of whether merger was required was not before the *Bradshaw* court; therefore, the opinion provides no discussion in support of Defendant's contention. On the other hand, a panel of this Court has found that aggravated child abuse, aggravated child neglect, and aggravated child endangerment were all "separate and distinct offenses" that pose "no double jeopardy issue[.]" *State v. Patterson*, No. W2017-01481-CCA-R3-CD, 2018 WL 4677522, at *10 (Tenn. Crim. App. Sept. 28, 2018), *perm. app. denied*. Defendant has failed to show that the trial court breached "a

- 12 -

clear and unequivocal rule of law[.]" *See Smith*, 24 S.W.3d at 282. Defendant is not entitled to plain error relief.

*Pre-Arrest, Post-Miranda Silence*

Defendant argues that the trial court violated her due process rights by allowing the State to comment on and elicit testimony at trial regarding her pre-arrest, post-*Miranda* silence, and she argues that the State cannot show that the trial court's errors were harmless beyond a reasonable doubt. The State argues that the comments and testimony regarding Defendant's post-*Miranda* silence did not violate Defendant's due process rights because she was not in custody when she refused to give a statement. In the alternative, the State argues that the error was harmless beyond a reasonable doubt. We agree with Defendant that her due process rights were violated by the State's comments and testimony elicited at trial, but we find such errors harmless beyond a reasonable doubt.

The comments and testimony presented by the State at trial of which Defendant complains concern an investigation performed by Investigator Richard DeSpain of the Lauderdale County Sheriff's Office. After medical personnel at the Dyersburg hospital examined the victim, they called law enforcement to report a case of suspected child abuse. Investigator DeSpain responded to the call. When he arrived, Investigator DeSpain spoke with hospital staff, who presented him with the victim and informed him that the victim showed signs of a broken arm and leg. Investigator DeSpain also noticed a "marking on the child's left eye . . . that was alarming." According to Investigator DeSpain, the victim was "very irritated, crying a lot."

Before leaving the hospital, Investigator DeSpain spoke with Ms. Booker, who gave him Defendant and Mr. Anderson's phone numbers. Investigator DeSpain called Mr. Anderson and informed him of the situation and asked whether Mr. Anderson intended to come to the hospital. At first, Mr. Anderson told Investigator DeSpain that he was not coming to the hospital because he was at work but later stated that he was not coming because he did not have money for gas. A few days later, Investigator DeSpain went to Defendant's and Mr. Anderson's home to speak with them. He informed the couple that he wished to speak with them at the sheriff's office. The couple went to the office to speak with Investigator DeSpain. Investigator DeSpain read Defendant and Mr. Anderson their *Miranda* rights, and both Defendant and Mr. Anderson declined to provide a statement. Both parties agree that Defendant and Mr. Anderson were not in custody when they refused to make a statement.

At trial, the State made the following comment in its opening statement regarding Defendant's and Mr. Anderson's refusal to provide Investigator DeSpain with a statement at the sheriff's office:

So [Defendant and Mr. Anderson were] a no show at Le Bonheur. So [Investigator] DeSpain knocks on the door. He also tried to call them at the Dyersburg [hospital] to try to get them to come there to see about the child and was given the same runaround excuses. And, you know, they didn't come for [Ms. Booker], they didn't come for [Investigator DeSpain]. They never show up at Le Bonheur. So do with that what you will.

So [Investigator] DeSpain goes out there and says, hey, your child was badly injured, and we need to have a conversation. And you need to come meet me up at the sheriff's department, which they did. But they did not – they chose not to give a statement, and he'll testify to that.

At the close of the State's opening statement, defense counsel for Defendant and Mr. Anderson requested a bench conference. In the conference, defense counsels objected to the State's comments on Defendant's and Mr. Anderson's refusal to give a statement to Investigator DeSpain. The State argued that its comments were proper because Defendant and Mr. Anderson were not in custody at the time. The trial court overruled the objection, finding that the State's comment was a "factual statement" made in a "non-custodial" setting that did not violate Defendant's or Mr. Anderson's "Fifth Amendment rights." The trial court did not give a curative instruction.

Prior to the State's case-in-chief, the trial court informed defense counsel that the State intended to elicit testimony from Investigator DeSpain about Defendant's and Mr. Anderson's refusal to provide a statement. The trial court asked whether defense counsel objected. Defense counsel objected and moved for a mistrial based on the State's opening statement, emphasizing that Defendant and Mr. Anderson received their *Miranda* warnings prior to refusing to give a statement. The State once again argued that its comments were proper because they were pre-arrest and further asserted that Investigator DeSpain's testimony regarding Defendant's and Mr. Anderson's refusal to provide a statement was necessary to "complete [the State's] story in that the parents did not come to the emergency room [or] Le Bonheur" and to ensure to the jury that a "complete investigation" was performed. The trial court denied a mistrial but limited Investigator DeSpain's testimony. The trial court explained:

I am going to allow Investigator DeSpain to testify that [Defendant and Mr. Anderson] came to the station, and that they did not give a statement and leave it at that. . . . I don't want it to be they declined or they refused or they were *Mirandized* or any of the rest of it. . . . I don't see how that impu[g]ns their Fifth Amendment right[.] I think it's fair for the jury to hear what the investigation was that occurred.

- 14 -

The trial court also ruled that the State could not comment on Defendant's and Mr. Anderson's refusal to provide a statement in its closing argument, and that it would provide limiting instructions to the jury at the close of trial.

During its case-in-chief, the State called Investigator DeSpain to testify, and the following interaction occurred:

[The State:] So you didn't have an opportunity to speak with the parents that night. Did you attempt to make contact with them later?

[Investigator DeSpain:] I did.

[The State:] Can you tell the ladies and gentlemen about that?

[Investigator DeSpain:] I went to their house[.] And I did go to the house and make contact with them there.

[The State:] Okay. And can you t[ell] how that went and what occurred?

[Investigator DeSpain:] I told them why I was there. Once again, they s[aw] me physically then, and I made a formal introduction in face. And I told them why I was there, that I needed to speak with them.

[The State:] Okay. Did you ask them to come meet you somewhere?

[Investigator DeSpain:] I did. I asked them to come and scheduled a time so they could come to the sheriff's office to speak with me.

[The State:] Okay. Did they come up here?

[Investigator DeSpain:] They did.

[The State:] And what occurred once they came up here?

[Investigator DeSpain:] They declined to make a statement.

At the close of trial, the trial court did not provide an instruction to the jury explaining that Defendant's failure to provide a statement to Investigator DeSpain could not be used as evidence of her guilt. The only instruction provided by the trial court regarding the issue of Defendant's right to remain silent read:

Defendant [did] not take the stand to testify, but you shall place no significance on this fact. [Defendant is] presumed innocent and the burden is on the State to prove [her] guilt beyond a reasonable doubt. [Defendant was] not required to take the stand . . . and [her] election not to do so cannot be considered for any purpose against [her] nor can any inference be drawn from such fact.

The United States Constitution protects an accused against compelled self-incrimination. U.S. Const. amend. V. In safeguarding this right, the United States Supreme Court in *Miranda v. Arizona* held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S 436, 478 (1966). Consequently, *Miranda* warnings are required "when a suspect is (1) in custody and (2) subjected to questioning or its functional equivalent." *State v. Moran*, 621 S.W.3d 249, 257 (Tenn. Crim. App. 2020) (citing *State v. Walton*, 41 S.W.3d 75, 83 (Tenn. 2001)). These warnings include the assurance that the accused has a "right to remain silent" and a warning that "anything said can and will be used against the individual in court." *Miranda*, 384 U.S 468-69.

In *Doyle v. Ohio*, the United States Supreme Court held that a prosecutor's use of a defendant's post-arrest, post-*Miranda* silence for impeachment purposes at trial violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution. 426 U.S. 610, 619 (1976). Recognizing that "[s]ilence in the wake of [*Miranda*] warnings may be nothing more than the arrestee's exercise of [his or her] *Miranda* rights[,]" the Court reasoned that "every post-arrest[, post-*Miranda*] silence is insolubly ambiguous[.]" *Id.* at 617-18. The Court further emphasized that "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who *receives* the warnings." *Id.* at 618 (emphasis added). Consequently, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.*

The *Doyle* rule was extended in *Wainwright v. Greenfield* to prohibit a prosecutor's substantive use of a defendant's post-arrest, post-*Miranda* silence at trial. 474 U.S. 284, 295 (1986). The Supreme Court "reiterate[d]" that *Doyle* "rest[ed] on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'" *Id.* at 291 (quoting *South Dakota v. Neville*, 459 U.S. 553, 565 (1983). "[B]reaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires." *Id.* at 291-92. Therefore, the Court reasoned that the use of a defendant's post-arrest, post-*Miranda* silence for substantive purposes was "equally

unfair" as using it for impeachment purposes. *Id.* at 292. The Court explained, "[i]n both situations, the State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized. In both situations, the State then seeks to make use of the defendant's exercise of those rights in obtaining his conviction." *Id.*

The State first argues that a defendant's pre-arrest silence is not protected by *Doyle* and its progeny. The Defendant argues that any post-*Miranda* silence should be granted such protection, even in cases where *Miranda* warnings were not required. We agree with Defendant.

The issue of whether pre-custodial, post-*Miranda* silence receives the protection of *Doyle* and its progeny has not been addressed by the United States Supreme Court and is one of first impression in Tennessee. However, several other courts have considered the issue, and the overwhelming majority of them weigh in favor of Defendant. *See Bartley v. Commonwealth.*, 445 S.W.3d 1, 9 (Ky. 2014) ("[W]e believe that the giving of *Miranda* warnings generally bars the use of any ensuing silence . . . even where the *Miranda* warnings are given unnecessarily."); *State v. Fencl*, 325 N.W.2d 703, 709-10 (Wis. 1982) ("[T]he *Doyle* rationale protects post-*Miranda* silence whether occurring before or after arrest."); *State v. Plourde*, 545 A.2d 1071, 1077-78 (Conn. 1988) ("The unfairness of using a defendant's silence following *Miranda* warnings is not mitigated by the absence of custody. . . . Custody is therefore not a prerequisite to a *Doyle* violation"); *Fencl v. Abrahamson*, 841 F.2d 760, 764-65 (7th Cir. 1988) ("We agree . . . that [the defendant's] due process rights were violated by the government's use of his prearrest, post-*Miranda* silence."); *but see State v. Robinson*, 496 A.2d 1067, 1072 (Me. 1985) ("In the case at bar no *Miranda* warnings were required for prophylactic or any other purpose, and there is nothing unfair in the circumstances present here in cross-examining defendant about his [pre-arrest, post-*Miranda*] failure to tell the officers the story he told on the stand").

After reviewing the relevant authority and the parties' arguments, we find that the lesson to be gleaned from *Doyle* and its progeny is that the reading of the *Miranda* warnings itself "implicitly assur[es] a suspect that his silence will not be used against him[.]" *See Wainwright*, 474 U.S. at 291 (quoting *Neville*, 459 U.S. at 565). The reading of *Miranda* warnings communicates to the suspect this implicit promise, whether the suspect is in custody or not at the time of their reading. Turning around and breaching that promise by using the suspect's silence against them at a later trial is "an affront to the fundamental fairness that the Due Process Clause requires." *Id.* at 291-92. Therefore, we hold that the State's use of a defendant's post-*Miranda* silence for substantive or impeachment purposes in its case-in-chief violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution, whether or not the giving of the warnings is required.

The State argues next that its comments and Investigator DeSpain's testimony did not rise to the level of a due process violation because there "is no evidence of prosecutorial exploitation" of the Defendant's post-*Miranda* silence. Instead, the State insists that the comment in the opening statement and Investigator DeSpain's testimony was necessary to "avoid leaving the jury with the impression that Investigator DeSpain never attempted to speak with [Defendant] about her child's injuries or did not fully investigate the case." The Defendant argues that the State's opening comments and Investigator's DeSpain's testimony violated her due process rights and that the trial court erred by "prioritiz[ing] the State's desire to tell its 'story' about [Defendant]'s silence at the expense of her fundamental right[.]" We agree with Defendant.

Regarding the State's comments during opening statements, our supreme court has adopted a two-part test for determining whether a prosecutor's comments regarding a defendant's exercise of the right to remain silent rise to the level of a due process violation. *State v. Jackson*, 444 S.W.3d 554, 587-88 (Tenn. 2014). "This two-part test inquires: (1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify *or* (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify." *Id.* (citing *Smith v. State*, 787 A.2d 152, 161-62 (Md. 2001) (Battaglia, J., concurring); *United States v. Morris*, 533 F. Appx. 538, 543 (6th Cir. 2013); *United States v. Rodriguez-Velez*, 597 F.3d 32, 44 (1st Cir. 2010)) (emphasis added). Moreover, while direct comments on a defendant's exercise of the right provide clearer evidence of a due process violation, "'indirect references on the failure to testify also can violate the Fifth Amendment privilege.'" *Id.* at 587 (quoting *Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000); citing *Felts v. State*, 354 S.W.3d 266, 282 n.10 (Tenn. 2011); *Morris v. State*, 537 S.W.2d 721, 723-24 (Tenn. Crim. App. 1976); *State v. Rutledge*, 66 P.3d 50, 55 (Ariz. 2003); *State v. Hodges*, 671 P.2d 1051, 1055 (Idaho 1983); *People v. Bannister*, 902 N.E.2d 571, 593-94 (Ill. 2008)). A trial court's determination of whether a prosecutor's comments on a defendant's exercise of the right to remain silent amount to a due process violation is reviewed de novo. *Id.*

In its opening statement, the State directly commented on Defendant's post-*Miranda* silence, informing the jury that Defendant and Mr. Anderson spoke with Investigator DeSpain at the sheriff's office but "chose not to give a statement[.]" This comment was immediately preceded by comments that Defendant and Mr. Anderson did not go to the Dyersburg hospital after being informed of the victim's injuries. The opening statement was then substantiated in evidence by Investigator DeSpain's testimony that Defendant and Mr. Anderson "declined to make a statement." Taken together, the jury "would necessarily have taken [the State's opening comments] to be a comment on [D]efendant's failure to" provide a statement and cooperate with law enforcement. *See Jackson*, 444 S.W.3d at 587-88. Furthermore, we find that the State's "manifest intent was

to comment" on Defendant's declining to provide a statement to law enforcement. *See id.* Indeed, the State at oral argument conceded that "general theme" of its case at trial was Defendant's "un-cooperativeness." With that theme in mind, the State explicitly commented on Defendant's post-*Miranda* silence and strategically chose to buttress the comment with a statement that Defendant refused to go to the Dyersburg hospital. While the State argues that it only intended to communicate to the jury that Investigator DeSpain had conducted a complete investigation, the Defendant never placed the thoroughness of the State's investigation at issue. Therefore, we find that the trial court violated Defendant's due process rights by allowing the State to comment on Defendant's post-*Miranda* silence. *See id.*

Regarding Investigator DeSpain's testimony, "'*Doyle* [and its progeny] do[] not impose a prima facie bar against any mention whatsoever of a defendant's [invocation of his or her rights] but instead guards against the exploitation of that constitutional right by the prosecutor." *State v. Dotson*, 450 S.W.3d 1, 56 (Tenn. 2014) (quoting *Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir., 1991)). The cornerstone of "a *Doyle* inquiry 'center[s] . . . around the particular use to which the post-arrest silence is being put[]' and, therefore, requires consideration of the particular circumstances of each case." *Id.* at 57 (quoting *Lindgren*, 925 F.2d at 202). Factors relevant to this determination include whether the post-arrest silence was used to rebut the defendant's argument, whether the trial court provided an appropriate instruction limiting the jury's consideration of the silence, and whether the State intended to create an inference of guilt based on the silence. *See id.* at 61-62.

As explained above, the State opened its case with a statement insinuating Defendant's guilt was based on her post-*Miranda* silence to support its "general theme" of Defendant's "un-cooperativeness." That argument was substantiated by Investigator DeSpain's testimony that Defendant "declined to make a statement." The State attempted to justify the testimony by arguing that it was necessary to assure the jury that Investigator DeSpain performed a complete investigation, but Defendant never placed the validity of the investigation at issue. Furthermore, the trial court failed to provide any instruction to the jury that the testimony regarding her declining to provide a statement could not be used as substantive evidence of Defendant's guilt. Therefore, we also conclude that the trial court erred by allowing Investigator DeSpain to testify about Defendant's post-*Miranda* silence because it allowed the State to "exploit[]" her post-*Miranda* silence to support its "general theme" of "un-cooperativeness" and to provide a basis from which the jury could infer guilt. *See Dotson*, 450 S.W.3d at 56.

Finally, the State argues that its comments during opening statements and the admission of Investigator DeSpain's testimony amounted to harmless error beyond a reasonable doubt because the evidence of Defendant's guilt was "overwhelming" and "a

passing comment about [Defendant]'s decision not to give a statement did not move the needle or affect the jury." Defendant argues that the State cannot show that the error was harmless beyond a reasonable doubt. Specifically, Defendant asserts that the evidence of her guilt was minimally sufficient at best and the jury's verdict hinged heavily on credibility determinations. She concludes that the State's comments and Investigator DeSpain's testimony regarding her refusal to make a post-*Miranda* statement "likely had a significant impact on the jury's decision making[.]" We agree with the State.

"The erroneous admission of evidence obtained in violation of a defendant's *Miranda* rights is a non-structural constitutional error, and as such, is subject to ... harmless error analysis." *State v. Climer*, 400 S.W.3d 537, 569-70 (Tenn. 2013). The State bears the burden of demonstrating beyond a reasonable doubt that a non-structural constitutional error did not contribute to the guilty verdict. *Id.* (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). "An inquiry into harmless error does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct." *Rodriguez*, 254 S.W.3d at 372. A non-structural constitutional error is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002) (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)) (internal citations omitted).

The portion of the State's argument based on Defendant's post-*Miranda* silence was not extensive. The State's opening statement and Investigator DeSpain's testimony were the only mentions at trial of Defendant's silence. In both circumstances, the mentions were limited to stating that Defendant declined to make a statement, and the State never explicitly argued to the jury Defendant's guilt based on her silence. Furthermore, the evidence admitted against Defendant in the State's case-in-chief was strong. As discussed above, Defendant and Mr. Anderson had exclusive custody of the victim when the victim sustained his fractured arm, fractured skull, brain bleed, and eye and forehead bruising. During the period in which the victim sustained his fractured ribs and legs, Defendant, Mr. Anderson, Ms. Booker, and Ms. Brown were the only people who cared for the victim. However, Ms. Booker and Ms. Brown both testified that nothing happened to the victim while he was in their care that could have caused the injuries. This testimony is further corroborated by the fact that Ms. Booker and Ms. Brown immediately sought care of the victim and that Defendant and Mr. Anderson both refused to see the victim in the Dyersburg hospital. Both PA Hawkins and Dr. Burge testified that the vicitm's injuries were highly "specific" for abuse, and Dr. Burge testified that she concluded that his injuries were the result of abuse. Finally, Dr. Burge testified that there was a "distinct possibility" that a caregiver would have discovered these injuries while dressing and otherwise caring for the victim because the victim would have been in a lot of pain. Therefore, we conclude that the trial court's erroneously allowing the State's comments and the admission of

Investigator DeSpain's testimony was harmless beyond a reasonable doubt. *Climer*, 400 S.W.3d at 569-70. Defendant is not entitled to relief on this issue.

*Count 4 – Clerical Error*

We note that the Judgment form for Count 4 mistakenly reflects indicted offense and convicted offense as aggravated child neglect (under 8). Upon remand, the clerical error in Count 4 should be corrected to properly reflect both indicted offense and convicted offense as aggravated child endangerment.

CONCLUSION

Based on the foregoing, we reverse the trial court's denial of Defendant's motion for judgment of acquittal as to Count 3 but affirm the trial court's judgments in all other respects.

*S/Timothy L. Easter*

TIMOTHY L. EASTER, JUDGE